IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEVIN BALDWIN,
   *Petitioner*

v.

UNITED STATES OF AMERICA,
   *Respondent*

Criminal Action No. ELH-17-0165;
Criminal No.: ELH-17-0199

**MEMORANDUM**

Kevin Baldwin, on his own behalf and through counsel, filed several motions for compassionate release, and supplements, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). *See* ELH-17-0165, ECF 49; ECF 50; ECF 52; ECF 62 (collectively, the "Motion"). He also submitted several exhibits. In general, defendant seeks relief from his sentence due to COVID-19, in light of his medical conditions and other circumstances. The government filed an opposition (ECF 66), with exhibits, including extensive medical records. ECF 66-4. Defendant has replied. ECF 68.[1]

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall grant the Motion.

**I.  Factual Background**

On March 29, 2017, defendant was indicted in Case ELH-17-0165 ("Case I") and charged with three counts of Money Laundering under 18 U.S.C. §§ 1956(a)(1)(B)(i) and (2). *Id.*, ECF 1. When agents executed the arrest warrant in connection with the indictment, they recovered distribution quantities of heroin, drug paraphernalia, and a loaded firearm from Baldwin's person

---

[1] Defense counsel originally filed the Motion only in Case ELH-17-0165. But, following a telephone conference with the Court, and with the consent of the government, the defense moved to consolidate this case with Case ELH-17-0199 for purposes of the Motion. *See* ELH-17-0165, ECF 69; ELH-17-0199, ECF 35. I granted the requests. ELH-17-0165, ECF 72; ELH-17-0199, ECF 39. For convenience, I shall cite primarily to the filings in ELH-17-0165.

and his residence. This led to an Indictment on April 5, 2017, in Case ELH-17-0199 ("Case II"), charging the defendant with drug and firearms offenses. *Id.*, ECF 7.

On September 12, 2017, the defendant entered a plea of guilty to Count One, Money Laundering, in Case I, and to Count Two, Possession with Intent to Distribute Controlled Substances, in Case II. *See* Case I, ECF 26; Case II, ECF 21. The guilty plea was tendered pursuant to a combined Plea Agreement. *See* Case I, ECF 27; Case II, ECF 22. And, pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a total sentence of 72 months of incarceration. *Id.* ¶ 5(c).

The Plea Agreement contained a stipulated statement of facts. *Id.* ¶ 5. According to the Stipulation, on or about June 15, 2015, the defendant delivered $127,060 in U.S. currency to an individual who was an undercover law enforcement officer. The defendant knew that the proceeds were derived from the sale of narcotics, and the transaction was designed to conceal the source of the proceeds. Case I, ECF 27, ¶ 5 at 4; Case II, ECF 22, ¶ 5 at 4. In July 2015, the defendant conducted two other monetary transactions involving proceeds from the sale of narcotic drugs. *Id.* "The total amount of drug proceeds laundered was $3883,70." *Id.*

As to Case II, on March 27, 2017, law enforcement conducted surveillance in the vicinity of 9416 Dunraven Street in Frederick, Maryland to locate Baldwin and apprehend him in connection with the arrest warrant issued for Case I. Case II, ECF 22, ¶ 5 at 5. During the surveillance, law enforcement observed Baldwin as he exited 9416 Dunraven Street and he was arrested. *Id.* At the time of defendant's arrest, investigators searched Baldwin and recovered from his front pocket a sandwich baggie containing four other individually wrapped bags of heroin. The heroin was packaged in a manner that indicated that it was intended for distribution. *Id.* Defendant was also in possession of nine cellular telephones.

A keychain recovered from defendant contained a house key for 9416 Dunraven Street and a key for a silver BMW vehicle. *Id.* From inside that vehicle, law enforcement recovered a remote control for the garage door opener for the Dunraven Street residence. *Id.*

Law enforcement obtained a search warrant for 9416 Dunraven Street. *Id.* Pursuant to the search warrant, investigators recovered a loaded .40 caliber Taurus pistol in the master bedroom, as well as a box of .40 caliber ammunition from the top of a dresser located in the same bedroom. *Id.* Identification in the name of Kevin Baldwin was located next to the ammunition. *Id.* In addition to the firearm and ammunition, investigators recovered about an ounce of heroin, a scale, and a strainer. *Id.* The total amount of heroin recovered from Baldwin and his bedroom was approximately fifty grams, with a street value of at least $5,000. *Id.*

Sentencing was held on December 15, 2017. Case I, ECF 37; Case II, ECF 32. In Case I, the sentencing transcript is docketed at ECF 63. Defendant was 49 years old at the time. Case I, ECF 35 (Presentence Report or "PSR"), at 3; Case II, ECF 30 (PSR). The Presentence Report, filed in both cases, reflected a final offense level of 25 and a criminal history category of II, with guidelines of 63 to 78 months of incarceration. *Id.* ¶ 63. The defendant's prior offenses included an armed robbery of a Brinks armored car in 1990, when the defendant was 21 years of age. That was the only prior offense that scored any points. PSR, ¶ 39. He received a total sentence of 15 years for that prior offense. *Id.* Baldwin was released from prison in November 2003, and his supervised release closed in November 2006. *Id.*

Pursuant to the terms of the C plea, the Court sentenced the defendant to concurrent terms of 72 months of imprisonment, with credit from March 27, 2017. Case I, ECF 38 (Judgment); Case II, ECF 33.[2] The defendant has served about 50% of his sentence. His current release date

---

[2] The government mistakenly references a sentence of 168 months. *See* ECF 66 at 28.

3

is June 29, 2021.  ECF 66 at 5.  However, on October 6, 2020, the defendant is scheduled for transfer to a Residential Reentry Center.  *Id.* n.2.  *See* ECF 70; ECF 71.

The Bureau of Prisons ("BOP") denied defendant's request for compassionate release or reduction in sentence, citing the fact that he is 51 years old and not eligible for early release under Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205.  *See* ECF 66-1.  Additionally, the BOP explained that the defendant does not have "an incurable, progressive illness" nor has he "suffered a debilitating injury from which [he] will not recover." *Id.*

On April 20, 2020, May 11, 2020, May 27, 2020 and June 16, 2020, the defendant, pro se, filed motions to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), due to the COVID-19 pandemic.  ECF 49; ECF 50; ECF 52.  Through counsel, he filed a supplemental submission on June 16, 2020.  ECF 62.  Petitioner seeks release from the BOP based on claims that his personal medical condition renders him vulnerable to COVID-19.  *Id.*  In particular, he cites his "uncontrolled hypertension, chronic concussion, glaucoma and [he] is pre-diabetic."  ECF 62 at 3.

## II.   Discussion

### A.  Statutory Background

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824-25 (2010); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying motion for compassionate release because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.

Section 3582(c) is titled "Modification of an imposed term of imprisonment." Under

5

§ 3582(c)(1)(A), the court, upon motion of the Director of BOP or the defendant, upon exhaustion of administrative rights, may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), a defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of the sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with the policy statement issued by the Sentencing Commission in U.S.S.G. § 1B1.13.

U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." The text mirrors the statute. Application Note 1 of U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows (emphasis added):

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:[3]
>
> (A)  Medical Condition of the Defendant.—
>
> > (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life

---

[3] Subsection (2) of U.S.S.G. § 1B1.13 establishes as a relevant factor that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

6

>expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>(ii) The defendant is—
>
>>(I) **suffering from a serious physical or medical condition**,
>>
>>(II) suffering from a serious functional or cognitive impairment, or
>>
>>(III) experiencing deteriorating physical or mental health because of the aging process,
>
>that **substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility** and from which he or she is not expected to recover.

Other extraordinary and compelling reasons include the age of the defendant (Application Note 1(B)) and Family Circumstances (Application Note 1(C)). Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D).

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. The Guideline policy statement in U.S.S.G. § 1B1.13, along with the application notes, and BOP Program Statement 5050.50 define "extraordinary and compelling reasons" for compassionate release based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D.

7

Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 827. But, compassionate release is a "rare" remedy. *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### B.  COVID-19

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, ___ F. Supp. 3d ___, 2020 WL 2556496, at *1 (D. Md. May 20, 2020). That crisis is COVID-19.[4] The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

To be sure, the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death,

---

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *Antietam Battlefield*, 2020 WL at 2556496, at *1 n.1 (citation omitted).

especially for those in "high-risk categories…." *Antietam Battlefield KOA*, ___ F.Supp. 3d ___, 2020 WL 2556496, at *1 (citation omitted). Unfortunately, there is currently no vaccine, cure, "or proven effective treatment" that is available. *Id.* (citation omitted).

The pandemic is the worst public health crisis since 1918. *See United States v. Hernandez*, ___ F. Supp. ___ 3d, 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020). It "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), stayed, ___ Fed. App'x ___, 2020 WL 3100187 (6th Cir. June 11, 2020). For a significant period of time, life as we have known it came to a halt. Although many businesses have reopened, they are generally subject to substantial restrictions. And, in view of the recent resurgence of the virus, businesses are again facing closure.

As of August 14, 2020, COVID-19 has infected about 5.3 million Americans and caused over 168,000 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed August 14, 2020). Moreover, according to the Centers for Disease Control and Prevention ("CDC"), certain risk factors increase the chance of severe illness. The risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are At Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, to reflect the most recently available data, the CDC revised its guidance as to conditions that pose a higher risk of severe illness from COVID-19. Then, on July 17, 2020, the CDC again updated its guidance as to health conditions that present a greater risk for complications from COVID-19. *See People of Any Age with Underlying Medical Conditions*,

CTRS. FOR DISEASE CONTROL & PREVENTION (July 17, 2020), https://bit.ly/38S4NfY.  According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; and Type 2 diabetes.

The CDC has also created a second category of conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include cerebrovascular disease, hypertension, pregnancy, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, smoking, and Type I diabetes. *See id.* Moderate to severe asthma is an underlying medical condition that was moved to the new category by the CDC; it is now identified as a condition that "might" put an individual at higher risk for COVID-19 complications. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed May 21, 2020).  Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2.  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*, *see also Cameron*, 2020 WL 2569868, at *1.  Moreover, they are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See United States v. Atkinson*, 19-cr-55-JCM, 2020 WL 1904585, at *4 (D. Nev. Apr. 17, 2020) (recognizing that "'even in the best run prisons'" it is difficult to follow CDC guidelines); *Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and

10

detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely");[5] *accord Brown v. Plata*, 563 U.S. 493 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. *See* ECF 66 at 10-12 (detailing extensive preventive and mitigation measures that BOP has implemented to combat COVID-19). Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and BOP employees from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Moreover, Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *Hallinan v. Scarantino*, ___ F. Supp. 3d

---

[5] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

\_\_\_, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Nevertheless, as with the country as a whole, the virus persists in penal institutions.[6] As of August 20, 2020, the BOP has 127,540 federal inmates and 36,000 staff. Also, as of August 20, 2020, the BOP reported that 1,407 inmates and 616 BOP staff currently tested positive for COVID-19; 10,151 inmates and 856 staff have recovered from the virus; and 115 inmates and one staff member have died from the virus. Of the inmate deaths, four of the individuals were on home confinement. And, the BOP has completed 45,418 COVID-19 tests. *See* https://www.bop.gov/coronavirus/ (last accessed August 21, 2020).

With respect to FCI Allenwood Low, where the defendant is a prisoner, the government asserts that there were no reported cases among the inmates as of June 10, 2020. *See* ECF 58 at 1; *see also* ECF 62 at 11 (noting that as of June 14, 2020, two staff members at Allenwood had tested positive. A review of the BOP website reflects that one inmate and one staff member at the institution have recovered. But, as the defendant observes, there is a distinction between the lack

---

[6] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide," N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2.

of confirmed COVID-19 cases and zero COVID-19 cases. *See* ECF 62 at 12 (citing *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020).

### C. Analysis

Defendant claims that he suffers from uncontrolled hypertension, post-concussional syndrome, glaucoma, and is pre-diabetic. ECF 62 at 3; ECF 52 at 11; ECF 66-4.[7] As to his concussive syndrome, Baldwin explains that while he was incarcerated at Fort Dix, a correctional officer assaulted him, damaged his eye, and he suffered a concussion, for which he now requires several medications. *Id.* at 1-2. Defendant also complains that his medical care at Allenwood Low, to which he was transferred after the assault, has been inadequate. *Id.*

Defense counsel has cited a recent study, published in the Journal of the American Medical Association ("JAMA"), which found that among 5700 patients in New York City who were hospitalized with COVID-19, the most common underlying medical conditions were hypertension (56.6 percent), obesity (41.7 percent), and diabetes (33.8 percent). *See* Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020). And, a similar study of Italian patients admitted to the hospital who later died from COVID-19 revealed that hypertension was the most common pre-existing health condition, which was detected in 68 percent of patients who died after contracting the virus. *See* Statista Research Department, *Most common comorbidities observed in coronavirus (COVID-19) deceased patients in Italy as of May 2020*, Statista (May 19, 2020). Indeed, Judge Chuang recently stated in a case involving a motion for release pending sentencing: "As of March 2020, three-fourths of individuals who died from COVID-19 in Italy

---

[7] As of about a year ago, the defendant was slightly overweight. *See* ECF 66-4 at 46-47. He had a BMI of 28.3, with a weight of 206 pounds. *Id.* at 4. His maximum recommended weight was 192 pounds. *Id.*

had hypertension." *United States v. Keaton*, TDC-18-215, ECF 84 at 5 (D. Md. Apr. 23, 2020) (citing *Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *1 (D. Md. Apr. 3, 2020)).

The government observes that there have been no reported COVID-19 cases at FCI Allenwood, where defendant is housed. ECF 58 at 1. But, the defendant posits that there is no evidence that the institution is actually conducting testing. ECF 62 at 10; *see also United States v. Pabon*, 17-165, 2020 WL 2112265, at *5 (D. Mass. May 4, 2020) (noting that BOP has tested so few inmates, which underestimates the true number of infections). He also notes that "zero cases can become deadly hotspots within a matter of days . . . ." *Id.* at 11.

The government "does not deny that [Baldwin] suffers from multiple negative health conditions." ECF 66 at 19. But, it disputes that he is at risk of COVID-19 complications. *Id.* at 20-21. I am satisfied that Baldwin is eligible for release under § 3582(c)(1)(A)(i). His medical conditions certainly render him more susceptible to serious illness or death if he were to contract the coronavirus.

Indeed, numerous courts have found that, in light of the COVID-19 pandemic, serious chronic medical conditions (and advanced age) qualify as a compelling reason for compassionate release. *See United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (defendant is 56 years of age and suffers from multiple sclerosis and hypertension); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (defendant has hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Bess*, No. 16-cr-156, 2020 WL 1940809, at *8 (W.D.N.Y. Apr. 22, 2020) (defendant has congestive heart failure, coronary artery disease, diabetes, and hypertension); *United States v. McCarthy*, ___ F. Supp. 3d ___, 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020) (defendant "is 65 years old and suffers from COPD, asthma, and other lung-related ailments"); *United States v.*

*Zukerman*, ___ F. Supp. 3d ___, 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (defendant has diabetes, hypertension, and obesity); *United States v. Rodriguez*, ___ F. Supp. 3d ___, 2020 WL 1627331, at *12 (E.D. Pa. Apr. 1, 2020) (defendant has Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity); *United States v. Gonzalez*, No. 18-CR-1536155, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020) (defendant "is in the most susceptible age category (over 60 years of age) and her COPD and emphysema make her particularly vulnerable"). *See also, e.g., United States v. Rodriguez*, ___ F. Supp. 3d ___, 2020 WL 4592833, at *2-3 (S.D. Cal. Aug. 5, 2020) (grating compassionate release to defendant with asthma and major depressive disorder); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) ("Courts have found that the combination of prediabetes and obesity have been sufficient to warrant release"); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity constituted an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason).

I turn next to the matter of the defendant's danger to the community and the factors under 18 U.S.C. § 3553(a). These include: (1) the nature of the offense and the defendant's

characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Sentence was imposed on December 18, 2017 (ECF 37; ECF 38), with credit dating to March 27, 2017. Thus, the defendant has served more than half of his sentence, exclusive of good conduct credit.

The Court is mindful that the defendant was convicted of a serious federal offense in 1990, when he was young. But, at the time of sentencing here, the 1990 offense was the only prior offense that scored any points. *See* Case I, ECF 35 (Presentence Report). As a result, the defendant had a relatively low criminal history category of II.

The Court also notes that the defendant is married and the father of three children. ECF 62 at 16. He began using heroin in 2016. PSR, ¶ 57. Significantly, the BOP has approved Baldwin's transfer to a Residential Reentry Center ("RRC") on October 6, 2020. ECF 70; ECF 71. In particular, he is due to report to Volunteers of America in Baltimore. ECF 71. That "placement is in connection with his participation in the RDAP (Residential Drug Abuse Treatment Program) . . . ." ECF 66 at 5 n.2; *see also* ECF 71. This reflects Baldwin's efforts at rehabilitation while incarcerated. Moreover, it suggests that the BOP does not regard Baldwin as a serious danger to the community, which is another important consideration here.[8]

---

[8] The Court recognizes that placement at an RRC is part of the service of the sentence and, between now and October 6, 2020, a disciplinary infraction could alter defendant's eligibility. *See* ECF 71.

The defendant also indicates that he has secured employment at a Walgreen's. ECF 49 at 2. The Court commends the effort to secure employment. But, this is a rather poor choice for a former drug abuser.

### III.   Conclusion

For the foregoing reasons, I shall grant the Motion (ECF 49; ECF 50; ECF 52; ECF 62). Baldwin's sentence shall be reduced to time served plus 14 days, to be followed by three years of supervised release.

I will require a one-year period of home confinement as a condition of supervised release. Substance abuse treatment was made a condition of supervised release, and that condition remains unchanged. The Court will add as a condition that the defendant undergo mental health treatment, as directed by the probation agent.[9]

A separate Order follows.

Date:   August 21, 2020                                  /s/
                                                  Ellen Lipton Hollander
                                                  United States District Judge

---

[9] I have added this condition because a review of the records suggests that the defendant has anger management issues related to the assault and his health care. At a medical appointment in January 2020, for example, the defendant was described as "loud and aggressive" and "very unpleasant." ECF 66-4 at 21-22.